Filed 7/14/14  P. v. Santos CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B245656 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA068189) |
| v. | |
| DAVID CESAR SANTOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin Herscovitz, Judge.  Affirmed.

Sylvia Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant David Cesar Santos appeals from the judgment of conviction entered after a jury found him guilty of assault upon a peace officer (Pen. Code,[1] § 245, subd. (c); count 1), six counts of second degree robbery (§ 211; counts 2, 3, 4, 7, 8, 9), and attempted second degree robbery (§§ 211, 664; count 6),[2] and also found true the allegation in each count that the offense was committed for the benefit of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).[3] The trial court sentenced Santos to state prison for a total of 20 years, consisting of the middle term of three years and a consecutive term of 10 years pursuant to section 186.22, subdivision (b)(1)(C), on count 2, plus an additional seven years comprised of consecutive terms of one-third of the middle term on all remaining counts.

Santos contends that (1) the improper admission of evidence of prior bad acts violated his federal due process rights and deprived him of a fair trial, (2) the trial court committed prejudicial error in instructing the jury regarding the evidence of his prior bad acts, and (3) the evidence is insufficient to support the jury's findings on the gang enhancement allegations. We affirm.

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

[2] The information did not include a count 5.

[3] In counts 2, 3, 4, 6, 7, 8, and 9, the People charged Santos jointly with Christopher Rosalio Morales, who is not a party to this appeal.

# FACTS

A.  *The Crimes (In Chronological Order)*

1.  June 14, 2011 (Count 4)

On June 14, 2011, between 10:00 and 11:00 a.m., Victor Villa was walking towards a lunch truck at Lanark Park in Canoga Park when he saw a PT Cruiser with four to six occupants drive past, turn around, and park. Villa turned his attention back to the lunch truck when a tall man, whom he later identified as Morales, approached him from the front. A smaller, younger man, whom Villa never identified but whom Santos admits was him, approached him from the side. Morales demanded Villa's wallet and threatened to jump him if Villa refused. The smaller man said nothing but showed Villa he had something black in his waistband. Fearing that the smaller man might have a gun, Villa gave Morales his wallet. Morales took the wallet and a cell phone Villa had in his hand. Morales and his accomplice walked to the PT Cruiser. Morales got into the front passenger seat while the smaller man entered the rear passenger seat. The driver, who was not identified, drove off.

2.  June 16, 2011 (Counts 7, 8, and 9)

On June 16, 2011, at approximately 3:00 p.m., high school seniors Jesus S., P.O., and F.S. were on a street corner in North Hollywood waiting for a friend. P.O. noticed a silver PT Cruiser make a right turn and park down the street. After seeing two men get out of the car, P.O. turned his attention elsewhere.

At some point, the two men approached the three students from different sides of the street. The heavier man approached from the front, while the smaller man approached from behind. The heavier man asked, "Where you from?" F.S. and P.O. believed the person asking the question was a gang member, and F.S. understood the question to be asking if he was a member of a gang or affiliated with any gangs or crew. F.S., who was scared, answered, "Nowhere." P.O. and Jesus S. also were afraid. None of the students belonged to a gang. The heavier man said he had a gun. He demanded

3

that the three students give all of their property to the smaller man, who said nothing. The three students complied, and the men then ran to the PT Cruiser and drove off.

All three victims subsequently identified Morales from a photographic lineup. Jesus S. circled Santos' picture after viewing a photographic lineup, stating that he resembled the person who took his belongings. F.S. and P.O. were unable to identify Santos. At the preliminary hearing Jesus S. and F.S. identified Santos, but P.O. did not. At trial F.S. and P.O. identified Santos as the robber to whom they handed their belongings. Jesus S. felt "more certain" that Santos resembled the smaller robber. They also identified a photo of the PT Cruiser as similar to the car driven by the robbers.

### 3. June 17, 2011 (Count 6)

On June 17, 2011, around noon, Brian Camacho was walking in Pacoima when he noticed a silver PT Cruiser stopped in the middle of the street. The passenger door was open but only the driver was inside. As Camacho continued walking Morales came up from behind, grabbed him, slammed him into a concrete wall, and said, "Give me everything you got. I have a gun." Morales tried unsuccessfully to remove Camacho's wallet from his back pocket and then hit him with a metal tool, chipping his tooth. Camacho hit his assailant in the face, causing him to drop the tool. Morales picked up the tool and ran to the PT Cruiser, which drove away. Camacho was unable to identify the driver.

### 4. June 21, 2011 (Counts 1, 2, and 3)

On June 21, 2011 Santos was living in Los Angeles with his girlfriend Sharon Gonzalez.[4] That morning Santos asked to borrow Gonzalez's PT Cruiser because he wanted to visit his mother's grave. He left in the car around 7:00 a.m.

---

[4]     Santos moved from Lancaster to Gonzalez's residence in Los Angeles in January 2011.

4

At approximately 2:30 p.m., Jesus Sanchez was near Sylvan Street and Beck Avenue in North Hollywood. He was walking home from work when Morales approached him on foot, asked "Do you want to die?" and directed Sanchez to give him everything he had. Sanchez, who felt threatened, gave his wallet to Morales, who also pulled off the gold chain that Sanchez was wearing around his neck. The driver of a car said to Morales, "Hurry up."[5] Morales escaped in the car.

Sanchez went directly home to notify the bank where he had his accounts. He then left his house to replace the bus pass that had been in his wallet when Morales stole it. When he went back outside, Sanchez saw a number of police officers at the corner on Beck Avenue. Sanchez told one of the officers that he had been robbed. Sanchez later identified Morales as the person who robbed him but was unable to identify the person driving the car.

Later that same day, Herman Sherman was walking near Sylvan Street and Beck Avenue in North Hollywood when Morales and Santos approached him. Morales used a racial slur, announced that it was a robbery, and demanded Sherman's money. Morales also stated that he had a gun and was going to kill Sherman. At first Sherman thought it was a joke, but when Morales tried to grab him, Sherman pushed Morales. A struggle ensued during which Morales tried to take Sherman's watch. While the two men struggled, Santos "snatched" Sherman's keys from his pants pocket. Santos and Morales then fled in a PT Cruiser.

By coincidence, members of an undercover narcotics team from the Glendale Police Department were conducting surveillance nearby. From his parked car Detective John Balian saw a silver PT Cruiser approaching northbound and watched it from across the street. For 10 to 15 seconds, Santos and his passenger made eye contact with the detective. Eventually, the two men drove away.

---

[5] Sanchez was confused about how the car arrived at the scene. Sanchez testified, "Everything went very fast. When the car left, I went in the middle of the street to see the color of the vehicle."

Detective Balian, believing Santos and his passenger "were obviously up to no good" and intended to commit a crime, telephoned another detective and notified him that the officers should conduct surveillance on the two men in the PT Cruiser. Detective Balian watched as the car travelled around within a three to four-mile radius in the vicinity of North Hollywood. Eventually, Detective Balian saw the PT Cruiser stop and witnessed Santos and Morales rob Sherman and flee in the PT Cruiser.[6] Detective Balian approached Sherman and identified himself as a police officer. Sherman told Detective Balian that he had been robbed and had seen the butt of a handgun. An unidentified man walked up to Detective Balian and handed him Sherman's keys that he had found in the middle of the street. Detective Balian notified the other officers, who continued the surveillance of the PT Cruiser.

Glendale Police Sergeant Louis Haloulakos and Officer Nelson Aguillon pursued the PT Cruiser. At one point during the pursuit, while Officer Aguillon was out of his car, he saw the PT Cruiser's reverse lights and the car came directly towards him in reverse at 20 to 25 miles an hour, forcing him to jump out of the way. The "momentum from the" car hit the officer's legs and pushed him into the door well of his car. The PT Cruiser also hit the open door of Officer Aguillon's car and bent it back. The PT Cruiser then stopped, and Officer Aguillon watched as Santos "mess[ed] with the gear shift and steering wheel." Fearing that Santos would try to hurt him again, Officer Aguillos "pointed at the center mass of [Santos'] back and fired one shot" through the rear driver's side door window, hitting him.

When the PT Cruiser came to a stop, Sergeant Haloulakos drove his car up to the PT Cruiser so that they were "nose to nose." The sergeant got out of his car, pointed his gun at Santos, and ordered him to raise his hands. Santos complied, and the officers removed him and Morales from the car.

---

**6**       Other officers witnessed the crime as well.

Gonzalez subsequently learned that Santos and Morales had been arrested while driving her car. Gonzalez contacted the police and retrieved the car from impound. Inside the car was the cell phone she shared with Santos and that Santos had been using during and in the vicinity of the robberies.

B.     *The Prior Act of Vandalism*

On August 13, 2010 Donald Fritz was working at a market in Lancaster. At approximately 8:30 p.m., while taking a cigarette break outside the market, Fritz saw a man spray painting on a wall directly across the street. The man, whom Fritz later identified as Santos, was bald and wore a brown shirt, long plaid shorts and a gold chain. Two other men were moving back and forth across the wall, acting as lookouts. After watching for about five minutes, Fritz notified the police.

Los Angeles County Sheriff's Deputy Michael Rose responded. Upon arriving he observed "fresh tagging" on a "large block wall" that surrounded an apartment complex. He believed the tagging was "fresh" because "there was an abundant amount of tagging on the wall" and he could smell the fresh odor of spray paint in the air." The words "Pac Town" had been painted on the wall. According to Deputy Rose the "tag" was associated with the "Pacas" street gang from Pacoima. Other graffiti on the wall in the same spray paint included the moniker "Rascal" and "MTCX3PWS661," which might be associated with the Midtown Criminals, a gang in Lancaster and Palmdale. Based on his experience, Deputy Rose understood that the Midtown Criminals and Pacas 13 had an alliance and cooperated with one another.

Deputy Rose approached the apartment in the complex that the tagger and other men had entered and could hear talking and loud music.[7] When he knocked on the door, someone looked out a window next to the door. Someone then closed the blinds and turned off the lights and music. Deputy Rose continued to knock for more than one

---

[7]     According to Deputy Rose, this apartment was visible from the area where the graffiti was spray painted and was about 75 feet away.

minute before someone answered the door and permitted him to enter the apartment. Deputy Rose saw five men, including Santos, a woman, and a small child, and he detained them all pending a field show-up. The deputy identified all five individuals, filled out an incident report, and took a picture of Santos, who was wearing a brown T-shirt, brown plaid shorts, brown shoes, and a black necklace. Santos had blue spray paint on his arms, fingernails, and clothing. Because none of the other men in the apartment had paint on their body or clothing, Deputy Rose believed Santos might be "Rascal."

### C.     *The Prosecution's Gang Evidence*

Los Angeles Police Officer Matthew Mitchell, a member of the West Valley gang enforcement detail, was assigned to monitor the Pacoima Criminals. According to Officer Mitchell, the Pacoima Criminals gang is "a subset of a parent gang called Pacoima or Pacas Trece." In the 1980's a number of members from the parent gang moved to Van Nuys and started the Pacoima Criminals. The Pacoima Criminals "immediately cliqued up" with a tagging crew[8] called the Insane Suspects, which by the late 1980's or early 1990's became known as the Insane Suspects Clique of Pacoima Criminals. The Pacoima Criminals are commonly known as Insane Suspects. There are 30 documented Pacoima Criminals in the West Valley Division. Their principal activities are "selling drugs, committing robberies, vandalism, [and] witness intimidation." The most common tattoos displayed by members of the Pacoima Criminals are "I.S.," which stands for Insane Suspects, and "5150." Officer Mitchell explained that "5150" refers to "the Welfare and Institutions Code for insane or suicidal."

Officer Mitchell observed the tattoo of an "I" and "S," as well as the number "5150," on Morales' chest and opined that Morales was a member of the Pacoima Criminals. The officer noted that in 2008 and 2009 Morales admitted to other officers that he was a member of the Pacoima Criminals and that his moniker is "Cash." Based

---

**8**     According to Officer Mitchell there is a difference between a tagging crew and a gang. A tagging crew paints on walls.

on Morales' admissions and his tattoos, Officer Mitchell believed that Morales was "a documented gang member." Officer Mitchell did not talk to any active members of Pacoima Criminals to determine if Morales was an active or former member of the gang. Although Santos did not have any tattoos, Officer Mitchell noted that not all gang members do.

Officer Mitchell observed that while gang members typically live within the territory of the gang, some live beyond its borders. He further noted that gang members sometimes commit crimes outside their gang territory. Indeed, a member of Pacoima Criminals who commits a robbery outside the gang's territory without identifying the gang might nonetheless benefit the gang by boosting the assailant's status in the gang to a higher level.

The prosecution's gang expert, Los Angeles Police Officer Timo Peltonen, was a member of the Foothill gang enforcement detail who had been following the Pacoima Trece or Pacoima Criminals street gang for five years. During this time, he interviewed members of the gang both in custody and on the street. He also investigated crimes they committed, as well as those committed against them.

Officer Peltonen testified regarding gang culture in general. He explained that a person who joins a gang is expected to commit crimes for the benefit of the gang. The more violent the crimes, the more the person's reputation and notoriety in the gang subculture grows. Gang members equate fear with respect. The more a person is feared the higher his status is within the gang. The gang also benefits by gaining the reputation of being a violent organization. Victims and witnesses fear retaliation and are less likely to come forward and aid in police investigations. Any crime of violence, such as robbery, "promotes and furthers the gang status both in the gang subculture and also in the communities where the gang's notoriety for violence is known." A gang also benefits monetarily from the crime of robbery.

One way a person signifies that he belongs to a gang is by using a moniker, which "is a second identity or nickname for a gang member." Another way of signifying gang

9

membership is by means of tattoos.  Gang members, however, do not automatically get tattooed.

Officer Peltonen further explained that a gang is "a ready-made man pool" and that its members commit crimes both within and outside the gang's territorial boundaries.  Because a gang member gains status and reputation within the gang by committing violent crimes, gang members commit crimes in numbers.  This ensures that there will be someone to bear witness to a particular gang member's actions and to report back to the gang.

With regard to gang hierarchy, Officer Peltonen explained that an associate occupies the lowest rung.  An associate typically engages in lower level crimes, such as vandalism by graffiti, and then works up to serving as a lookout for other gang members.  Graffiti marks territory, displays allegiances, and documents a gang's presence in an area.  Vandalism enhances the reputation of the gang by marking gang territory.  "It's a means of communicating threats or allegiances to other gangs.  It might be something as simple as establishing that the gang was in this certain area."  Vandalism in the form of graffiti is "a means of transmitting or transferring information.  You can claim your own neighborhood, give a threat to a rival neighborhood, establish that this is your area."  A person who commits crimes demonstrating allegiance to a gang can be considered an affiliate.  On the other hand, within gang culture there is a penalty if someone who is not a gang member presents himself as one.

The question "where you from" is a common gang challenge.  It announces that the inquirer is a gang member who wants to know if the person he or she is addressing is a gang member and, if so, what gang he or she belongs to.  Such an inquiry or challenge indicates that something serious is about to happen.  Therefore, a person who answers he is from "nowhere," signifying that he is not a gang member, may not necessarily escape harm.

Officer Peltonen further testified that Pacas is slang for Pacoima.  Pacoima 13 or Pacas Trece started in the 1950's and is one of the oldest gangs in the City of Pacoima.  It is primarily a Hispanic gang with approximately 300 documented members.  Pacoima 13

10

either authorized or inducted the Pacoima Criminals gang and allowed it to become a criminal street gang. Pacas 13 and Pacoima Criminals "get along," "work with each other," and have no disagreements or rivalries. Officer Peltonen opined that the author of the graffiti on the wall in Lancaster was associated with the Pacas 13 street gang.

When presented with a hypothetical mirroring the facts of this case, Officer Peltonen opined that Morales committed the crimes as a member of the Pacoima Criminals, that Santos committed the crimes as an associate or affiliate, and that both of them acted for the benefit of the gang. The facts that Morales and Santos did not mention or call out Pacas 13 or Pacoima Criminals during the commission of the crimes and that, with one exception, they committed the crimes outside of the territories of Pacas 13 and Pacoima Criminals, did not change Officer Peltonen's opinion.

Officer Peltonen stated his opinion that Santos committed his crimes in association with a criminal street gang, explaining, "If one is a documented or admitted Pacoima Criminals gang member and one is either a full fledged member [or] an associate of the Pacoima 13 criminal street gang, then they committed the crime of robbery in association with each other." Officer Peltonen agreed that the two acted in association because the Pacoima Criminals broke off from Pacas 13.

D.     *The Defense Case*
1.     Family Life

Edith Sotelo became Santos' stepmother when Santos was three years old. The family lived in the City of San Fernando until 2006 when they moved to a house in Lancaster. The family never lived in Pacoima.

In 2008 Santos moved to Panorama City to be with his biological mother who was ill. He stayed with her until she died in February 2009. During his time in Panorama City, Santos became close to Morales, his cousin, who helped Santos with his mother. Sotelo did not know if Morales was involved in a street gang. After Santos' biological mother died, Santos moved back to Lancaster and, in January 2011, moved in with Gonzalez in Los Angeles.

11

According to Sotelo, Santos was not in a gang and did not associate with gang members. Santos never wore baggy clothes but instead wore "clean tight shirts" and fitted pants in his size. Santos and Morales had not been close when Santos attended high school in Lancaster. Santos rarely traveled to the San Fernando Valley because he did not have transportation.

Geronimo Herrera met Santos in Lancaster. The two became close friends and spent a lot of time together. Herrera never knew Santos to associate with any criminal street gang or tagging crew. Herrera never saw Santos wear any gang-related jerseys or hats.

### 2. Defense Gang Expert

Martin Flores testified as a gang expert on behalf of Santos. Flores interviewed Morales and learned that in 2004 Morales began to distance himself from gang life and to focus on being a parent. Flores also determined that there was a four-year period during which Morales had no reported contact with police.[9] This gap buttressed Flores' conclusion that Morales had disassociated from gang life and was not an active gang member at the time of the offenses. Although Morales said he had "I.S." tattooed on his chest, he claimed that the initials stood for his daughter Isabella. Flores believed him at the time but, at trial, acknowledged that "I.S." stands for Insane Suspects. Morales failed to disclose his "5150" tattoo to Flores.

Although Flores did not interview any Pacoima Criminal members, he met with Santos' family and reviewed documents about Santos' involvement in this case. Flores focused on Pacas 13 and other gangs in the Pacoima area. Flores opined that Santos was

---

[9] One of the documents Flores reviewed was a field interrogation card pertaining to Morales dated February 13, 2009. The police officer filling out the card noted that the "subject claims he used to kick it with Pacoima from when he was 13." Flores explained that the term "kick it" has different meanings. At its "most innocent level," "kick it" can mean "chill," hang out, or party with others. At a more "intense level" it means "going out gang banging with them."

12

not a member of a criminal street gang because he had tattoos, no gang moniker, no gang paraphernalia, no gang photos, no gang correspondence, no admissions of gang membership, and no history of attending gang funerals. Flores also could not locate Santos in any gang database. The only item Flores found was Santos' 2010 juvenile vandalism case, which was the only documented contact Santos had with law enforcement. Flores testified that the failure of the police to put Santos into the gang database after the graffiti incident suggested "that they probably did not feel comfortable putting him in that gang database based on the information they [had]."

With regard to the vandalism charge, Flores believed there were multiple people who could have been responsible for the graffiti. When asked, hypothetically, whether his opinion would change if Santos had been the sole person responsible for the graffiti on the wall, Flores testified, "I think it could change my opinion, sure."

Flores further explained that the inquiry "where are you from" can have several connotations depending on the context in which it is made. In a "street" context it "can be used as a strategy to throw somebody off." It can also be used in a "gang" context. The context "will vary depending on what factors are at play." Asking "where are you from?" also can be "used as a tactic to make sure you don't hit up the wrong person."

Flores did not believe there was sufficient evidence that Morales and Santos committed the robberies for the benefit of a particular criminal street gang. There was no evidence that the property and money they stole ever made its way to any gang. On the other hand, Flores admitted that two gang members "associating in the capacity of their gang" were committing crimes together could meet the association theory of the gang allegation.

## DISCUSSION

A.    *Admissibility of Prior Act of Vandalism*

The prosecutor filed a pretrial motion making an offer of proof and seeking to admit evidence regarding Santos' prior act of vandalism in Lancaster. When the trial

13

court asked counsel for Santos if he had any objection, counsel objected solely on "foundational" grounds. Counsel for Santos stated, "I would like an opportunity to meet with the civilian witness before he testifies and, if I need to renew the objection, I will."

The trial court ruled that the evidence was admissible, noting it was "obviously relevant to the gang allegation." The court further noted that under Evidence Code section 352, the evidence is "circumstantial evidence that the defendant is a member of or working in cooperation with a gang." The court further noted that, compared to the charged crimes, his prior act of vandalism "is not so prejudicial as to unduly prejudice" him. The court invited counsel for Santos "to renew any foundational objections after interviewing the witnesses." Trial counsel for Santos did not state any disagreement with the court's ruling, nor does Santos on appeal identify any further objection to this evidence.

Santos argues, for the first time on appeal, that evidence of his prior act of vandalism was inadmissible under Evidence Code section 1101, subdivision (a), which provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Trial counsel for Santos, however, did not object pursuant to Evidence Code section 1101, and his foundation objection did not preserve this issue for appeal. The California Supreme Court has "'consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable'" on appeal. (*People v. Valdez* (2012) 55 Cal.4th 82, 130; see *People v. Alexander* (2010) 49 Cal.4th 846, 912 [defendant's failure to object to evidence regarding his prior commission of a serious criminal act as improper character evidence pursuant to Evidence Code section 1101 forfeited the issue on appeal]; *People v. Bradley* (2012) 208 Cal.App.4th 64, 89 [in the absence of a timely and specific objection to evidence on the ground that it is inadmissible character evidence under Evidence Code section 1101, subdivision (b), the issue is not preserved for appellate review]; see also Evid. Code, § 353.) Santos has also forfeited his argument that the admission of his prior act of

14

vandalism evidence violated his constitutional rights. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1088 [defendant forfeited constitutional claim by failing to raise it during trial].)

B. *Instructional Error*

The trial court instructed the jury regarding Santos' prior act of vandalism in accordance with CALCRIM No. 375 as follows:

"The People presented evidence of other behavior by the defendant that was not charged in this case that the defendant had sprayed graffiti.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged act. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that defendant committed the uncharged act, you may, but are not required to consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent to assist, further or promote criminal conduct by gang members and whether the defendant had a motive to commit the offenses alleged in this case. Do not use this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged act, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes or that the gang allegation is true. The People must still prove each charge and allegation beyond a reasonable doubt."

Santos argues that CALCRIM No. 375 "authorized the jury to use the preponderance standard to determine the issue of whether [he] committed the uncharged

15

offenses" and thus "it is reasonably likely the jury would have interpreted the instruction to authorize conviction on the charged offenses based on a standard other than proof beyond a reasonable doubt." The California Supreme Court has rejected this argument. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1179; *People v. Lewis* (2009) 46 Cal.4th 1255, 1297-1298; *People v. Reliford* (2003) 29 Cal.4th 1007, 1013-1015.) Santos concedes as much but explains that he "presents this argument to preserve the issue for further review."

### C.    *Gang Enhancements*

The jury found that Santos committed each of the charged crimes "for the benefit of or in association with a criminal street gang." Santos contends the evidence is insufficient to support the jury's gang enhancement findings. Although whether there is substantial evidence that Santos committed the crimes for the benefit of a gang is a close question, there is substantial evidence that Santos committed the crimes in association with a gang.

In June 2011 section 186.22, subdivision (b)(1), provided, with certain exceptions not applicable here, that "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." (See *People v. Garcia* (2014) 224 Cal.App.4th 519, 523.)[10]  Section 186.22, subdivision (b)(1), "requires proof of only two elements:  (1) that the defendant

---

[10]    Although Santos does not raise the issue, we note that neither attempted robbery nor assault on a police officer is a violent felony under section 667.5, subdivision (c).  In any event, the trial court did not impose a gang enhancement on either of these counts.

16

committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. [Citation.] It does not require proof that a defendant acted with the specific intent to promote, further, or assist a gang. [Citation.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.) "To establish a gang enhancement, a prosecutor must prove facts beyond the elements of the underlying offense. [Citation.] 'Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited to the charged offense.' [Citation.] To prove the gang enhancement, the prosecution may introduce expert testimony regarding street gangs. [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 820.)

The record contains ample evidence establishing that Morales was a member of Pacoima Criminals and that Santos, at minimum, was an affiliate or associate of Pacoima 13, also known as Pacas Treces.[11] As the California Supreme Court has observed,

---

[11]    As the People state in their respondent's brief, "it was never the prosecution's theory that [Santos] was a hard-core, documented member of any gang. It was the prosecution's position that, regardless of his membership, [Santos] was an affiliate or associate of a gang" and that he acted in concert with Morales. In any event, we note that section 186.22, subdivision (b), does not require that defendant be an active or current

however, "[n]ot every crime committed by gang members is related to a gang." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) Thus, mere status as a gang member or associate is not sufficient to establish that a crime is committed for the benefit of, at the direction of, or in association with any criminal street gang within the meaning of section 186.22, subdivision (b)(1). (See *Livingston*, *supra*, at p. 1170 [section 186.22, subdivision (b)(1), enhancement "applies 'only if the crime is "gang related"'"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [same]; *People v. Ochoa* (2009) 179 Cal.App.4th 650, 663 [a "gang enhancement cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes"].) Although "a crime committed by a defendant in association with other gang members or demonstrated to promote gang objectives may be gang related[,] . . . the record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.'" (*People v. Martinez* (2004) 116 Cal.App.4th 753, 762; see *People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 660.)

Here, the evidence showed that for one week in June 2011 Morales and Santos went on a crime spree, culminating in Santos' assault on a police officer. None of the crimes occurred within Pacoima Criminals territory and only one crime, the attempted robbery against Camacho, occurred in the City of Pacoima, the territory of Pacoima 13 or Pacas Treces. There is no evidence that Morales or Santos at any time prior to, during, or after the commission of these crimes called out the name of a gang, displayed gang signs, or wore any gang-related jerseys or hats. Nor is there any evidence that a gang-related event, confrontation, incident of disrespect, or challenge caused or preceded the crimes. There is no evidence that victims Villa, Sherman, Camacho, and Sanchez understood or perceived that their assailants were gang members or that their crimes were gang-related.

member of a gang. (See *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 206-207.)

18

The sole fragment of evidence suggesting gang activity was that Morales asked the three high school students where they were from, which two of the students believed meant Morales was a gang member and was asking whether they belonged to a gang. It is true that the inquiry, "Where you from?" is a typical gang challenge. This one fact, however, without any other gang-related facts, is not much evidence that the PT Crusier crime spree was for the benefit of Pacoima Criminals or the Pacas Trece gang. Indeed, it is difficult for a gang member (or an affiliate) to enhance a gang's reputation for violence in the community if the victim does not even know the gang to which the perpetrator belongs. (See *People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 663 ["it is difficult to imagine how that would benefit Moreno Valley 13 because the victim did not know to which gang, if any, defendant may have belonged"].) Officer Peltonen did testify that gangs can benefit financially from the money and property taken during robberies, but there is no evidence that Santos intended to or actually did confer any such a benefit on a criminal street gang in this case.

There is substantial evidence, however, that Santos committed the crimes in association with a criminal street gang. The commission of a crime by two or more gang members may support a finding that the defendant committed the crimes in association with a criminal street gang. For example, in *People v. Albillar*, *supra*, 51 Cal.4th 47, three members of a street gang raped a 15-year-old girl and threatened to kill her if she contacted the police. The Supreme Court held that there was substantial evidence "that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang." (*Id*. at p. 62.) The Supreme Court observed that the defendants "not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not contact the police." (*Id.* at pp. 61-62.)

19

In *People v. Morales* (2003) 112 Cal.App.4th 1176 the court held that the "evidence that defendant knowingly committed the charged crimes in association with two fellow gang members was sufficient to support the jury's findings on the gang enhancements . . . ." (*Id.* at pp. 1178-1179.) The court also rejected the defendant's argument "that reliance on evidence that one gang member committed a crime in association with other gang members is 'circular . . . .'" (*Id.* at p. 1198.) The court stated, "Arguably, such evidence alone would be insufficient, even when supported by expert opinion, to show that a crime was committed for the *benefit* of a gang. The crucial element, however, requires that the crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association* with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (*Ibid.*; see *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332 [following *Morales* and noting that section 186.22, subdivision (b)(1), sets forth three ways the prosecution can prove the crime was gang-related ("'committed for the benefit of, at the direction of, or in association with a[] criminal street gang'"), and holding that two gang members who committed a robbery did so "'in association with' the gang with the intent to assist criminal conduct"].)

Officer Peltonen testified that Santos and Morales committed the crimes in association with the Pacas 13 gang. His one-sentence explanation of why the crimes were committed in association with a gang was that "if one is a documented or admitted Pacoima Criminals gang member and one is either a full fledged member, an associate of the Pacoima 13 criminal street gang, then they committed the crime of robbery in association with each other." In other words, Officer Peltonen's testimony was that because two gang members (or one gang member and one gang affiliate) committed the crimes together, they did so in association with the gang. We do not think that this is very much evidence of association with a gang, but under the Supreme Court's decision

20

in *People v. Albillar*, *supra*, 51 Cal.4th 47, it is enough.  Therefore, substantial evidence supports the jury's finding that Santos committed the crimes in association with a criminal street gang.

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.